CASE NO. 17-50102

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

### DEIDRE SEIM,
individually, and on behalf all others similarly situated,
*Plaintiff - Appellant,*

v.

## HOMEAWAY, INCORPORATED,
a Delaware Corporation,
*Defendant - Appellee.*

On appeal from the
United States District Court
for the Western District of Texas

## BRIEF OF APPELLEE

SCOTT DOUGLASS & MCCONNICO LLP
Jane M.N. Webre
  Texas Bar No. 21050060
David D. Shank
  Texas Bar No. 24075056
303 Colorado St., Suite 2400
Austin, Tex. 78701
T: 512-495-6300

MORGAN, LEWIS & BOCKIUS LLP
Bryan Killian
Stephanie Schuster
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000

J. Warren Rissier
300 South Grand Ave., 22nd Floor
Los Angeles, Cal. 90071
T: 213-612-2500

May 24, 2017

*i*

CASE No. 17-50102

IN THE

# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

## DEIDRE SEIM,
individually, and on behalf all others similarly situated,
*Plaintiff - Appellant,*

v.

## HOMEAWAY, INCORPORATED,
a Delaware Corporation,
*Defendant - Appellee.*

———————

# CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

- Deidre Seim (Plaintiff-Appellant)

- Jasper D. Ward, JONES WARD PLC (counsel for Ms. Seim)

- Michael Singley, EDWARDS LAW (counsel for Ms. Seim)

- Ketan U. Kharod, KHAROD LAW FIRM, PC (counsel for Ms. Seim)

CERTIFICATE OF INTERESTED PERSONS                    *ii*

- Robert Ahdoot, ADHOOT & WOLFSON, PC (counsel for Ms. Seim)

- Theodore W. Maya, ADHOOT & WOLFSON, PC (counsel for Ms. Seim)

- Bradley K. King, ADHOOT & WOLFSON, PC (counsel for Ms. Seim)

- HomeAway, Inc. (a dissolved Delaware corporation, which was merged into Expedia, Inc., a publicly traded Delaware corporation) (Defendant-Appellee)

- Expedia, Inc. (the publicly traded Delaware corporation into which HomeAway, Inc., has merged)

- Stephen E. McConnico, SCOTT DOUGLASS & MCCONNICO LLP (counsel for HomeAway)

- Michael L. Meriman, SCOTT DOUGLASS & MCCONNICO LLP (counsel for HomeAway)

- Jane M.N. Webre, SCOTT DOUGLASS & MCCONNICO LLP (counsel for HomeAway)

- David D. Shank, SCOTT DOUGLASS & MCCONNICO LLP (counsel for HomeAway)

- Bryan Killian, MORGAN LEWIS & BOCKIUS LLP (counsel for HomeAway)

- Stephanie Schuster, MORGAN LEWIS & BOCKIUS LLP (counsel for HomeAway)

- J. Warren Rissier, MORGAN LEWIS & BOCKIUS LLP (counsel for HomeAway)

/s/ Bryan Killian
Attorney of record
for HomeAway, Inc.

May 24, 2017

# STATEMENT REGARDING ORAL ARGUMENT

While this appeal can easily be decided on the briefs, oral argument may be worthwhile because this case is related to a pending appeal for which oral argument will be helpful—*Arnold v. HomeAway, Inc.*, No. 17-50088 (5th Cir.).

# CONTENTS

*i*    Certificate of Interested Persons

*iii*    Statement Regarding Oral Argument

*vi*    Authorities

*viii*    Glossary

1    Issue Presented

2    Relevant Statute—9 U.S.C. § 2

3    Introduction

5    Statement of the Case

5    I.    HomeAway provides listing services to subscribers like Ms. Seim.

5    II.    Ms. Seim agreed to arbitrate any and all claims with HomeAway.

9    III.    Ms. Seim sues HomeAway for its business decision to charge fees to travelers, and the district court compels Ms. Seim to arbitrate.

12    Summary of Argument

14    Argument

14    I.    An arbitrator must decide Ms. Seim's objections.

**16**   II.   The arbitration agreement in the February Terms & Conditions applies to all of Ms. Seim's claims.

**16**   A.   The plain language of the arbitration agreement does not distinguish among types of claims.

**18**   B.   Arbitration agreements often encompass a wide range of claims.

**21**   C.   Ms. Seim's attempts to portray the arbitration agreement as ambiguous lack merit.

**24**   III.   No contract defense limits the scope of the parties' arbitration agreement.

**26**   A.   Ms. Seim concedes she agreed to and is bound by the February Terms & Conditions.

**27**   B.   Ms. Seim had sufficient notice of the arbitration agreement.

**28**   C.   Ms. Seim does not dispute that the February Terms & Conditions are supported by consideration.

**29**   D.   The Terms & Conditions are not illusory.

**31**   E.   Ms. Seim's unconscionability arguments are equally meritless.

**33**   Conclusion

**34**   Certificate of Compliance

**35**   Certificate of Service

# AUTHORITIES

## CASES

*Anderson v. Waffle House, Inc.,*
920 F. Supp. 2d 685 (E.D. La. 2013)
 page 18

*AT&T Mobility LLC v. Concepcion,*
563 U.S. 333 (2011)
 page 32

*Cooper v. WestEnd Cap. Mgmt.,*
832 F.3d 534 (5th Cir. 2016)
 page 15

*Doctor's Assocs. v. Casarotto,*
517 U.S. 681 (1996)
 page 19

*Douglas v. Regions Bank,*
757 F.3d 460 (5th Cir. 2014)
 page 14

*Energy Home, Inc. v. Peay,*
406 S.W.3d 828 (Ky. 2013)
 page 31

*G.M. Corp. v. Pamela Equities Corp.,* 146 F.3d 242 (5th Cir. 1998)
 page 21

*Glazer v. Lehman Bros.,*
394 F.3d 444 (6th Cir. 2005)
 page 28

*Gove v. Career Sys. Dev. Corp.,*
689 F.3d 1 (5th Cir. 2012)
 page 25

*Hancock v. AT&T Co.,*
701 F.3d 1248 (10th Cir. 2012)
 page 27

*Hornback v. Larue Cnty. Coop. Fair, Inc.,*
No. 2013-001829, 2014 WL 7344390 (Ky. Ct. App. Dec. 24, 2014)
 page 23

*In re Cox Enters., Set-top Cable Television Box Antitrust Litig.,*
835 F.3d 1195 (10th Cir. 2016)
 page 19

*Kindred Nursing Ctrs. v. Clark,*
— S. Ct. — , 2017 WL 2039160 (U.S. May 15, 2017)
 pages 26, 32

*Kubala v. Supreme Prod. Servs.,*
830 F.3d 199 (5th Cir. 2016)
 page 14

*Ky. Shakespeare Festival, Inc. v. Dunaway,*
490 S.W.3d 691 (Ky. 2016)
 pages 21, 22

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,*
473 U.S. 614 (1985)
        page 19

*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,*
460 U.S. 1 (1983)
        page 21

*Nat'l Union Fire Ins. Co. v. Circle, Inc.,* 915 F.2d 986 (5th Cir. 1990)
        page 17

*Pennzoil Exploration & Production Co. v. Ramco Energy Ltd.,*
139 F.3d 1061 (5th Cir. 1998)
        page 18

*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.,*
687 F.3d 671 (5th Cir. 2012)
        page 15

*Pilon v. Univ. of Minn.,*
710 F.2d 466 (8th Cir. 1983)
        page 17

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.,*
388 U.S. 395 (1967)
        page 21

*Reid v. Reid,*
20 S.W.2d 1015 (Ky. 1929)
        page 23

*Rent-A-Center W., Inc., v. Jackson,*
561 U.S. 63 (2010)
        pages 12, 14

*Reyes v. Manor Indep. Sch. Dist.,*
850 F.3d 251 (5th Cir. 2017)
        pages 21, 30

*Reyna v. Int'l Bank of Commerce,*
839 F.3d 373 (5th Cir. 2016)
        page 15

*Schnuerle v. Insight Communc'ns,*
376 S.W.3d 561 (Ky. 2012)
        pages 27, 31

*Southland Health Servs. v. Bank of Vernon,* 887 F. Supp. 2d 1158 (N.D. Ala. 2012)
        page 19

*Tickanen v. Harris & Harris, Ltd.,*
461 F. Supp. 2d 863 (E.D. Wisc. 2006)
        page 19

*Volt Info. Sciences, Inc. v. Bd. of Trustees,* 489 U.S. 468 (1989)
        page 19

STATUTE

9 U.S.C. § 2
        pages 2, 24

# GLOSSARY

| Abbreviation / Acronym | Expansion |
|---|---|
| AAA | American Arbitration Association |
| FAA | Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* |

# ISSUE PRESENTED

HomeAway operates websites on which property owners and managers, like Deidre Seim, offer to rent those properties on a short-term basis to travelers. Ms. Seim purchased five subscriptions to list five properties on HomeAway's websites. When renewing one of her subscriptions, Ms. Seim agreed to arbitrate "any and all Claims" related to HomeAway's websites, products, and services, and she agreed to arbitrate any threshold questions of arbitrability that the parties might have in any particular dispute. One month later, Ms. Seim sued HomeAway over its decision to charge fees to travelers booking reservations through its websites.

This appeal presents a single question:

> Whether the district court correctly held that Ms. Seim must arbitrate her disputes with HomeAway.

# RELEVANT STATUTE

9 U.S.C. § 2

Validity, irrevocability, and enforcement of agreements to arbitrate

A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

# INTRODUCTION

HomeAway provides a web-based platform for property owners and managers to attract rental business from vacation travelers. Use of that platform is subject to HomeAway's terms and conditions. When users initially subscribe or renew their subscriptions, they must review the then-current terms and conditions and decide whether to agree to them.

Deidre Seim lists five properties that she owns in Kentucky on HomeAway's websites. (Ms. Seim markets her properties as "Kentucky Derby Home," "FabHistoric Home," "Historic District Townhouse," "Beautiful Baxter Ave Townhouse," and "Ideal Louisville Home.") Ms. Seim is trying to litigate a dispute with HomeAway over a traveler fee it implemented last year, and which she contends results in fewer bookings through HomeAway's websites.

One month before filing this lawsuit, Ms. Seim renewed the subscription for the Kentucky Derby Home and, when she did, agreed to submit "any and all Claims" related to HomeAway's products or services to binding arbitration. But Ms. Seim now refuses to arbitrate and contends that she misunderstood her agreement to arbitrate "any and all Claims" as an agreement to arbitrate only claims related to the Kentucky Derby Home. Ms. Seim's after-the-fact understanding is not dispositive; the plain language of the arbitration agreement is dispositive. And the district court compelled arbitration because the plain lan-

guage of the arbitration agreement covers "any and all Claims," not merely a subset of claims related to a particular property. (Ms. Seim's claimed misunderstanding is largely beside the point: since filing suit, Ms. Seim has renewed the subscriptions for her other four properties, each time affirmatively assenting to an arbitration agreement that is identical to the one she admits she agreed to.)

While they appear many, Ms. Seim's arguments on appeal are one. She calls "any and all Claims" an ambiguous phrase that ought to be interpreted to mean "only claims related to the Kentucky Derby Home." She challenges the sufficiency of her assent to the arbitration agreement, but only as applied to her other properties. She says the arbitration agreement lacks consideration, but only as applied to her other properties. She contends that the arbitration agreement is illusory, but only as applied to her other properties. And she insists that the arbitration agreement is unconscionable, but only as applied to her other properties. Through all those arguments, Ms. Seim seeks to limit the scope of her undisputed agreement to arbitrate "any and all Claims" in precisely the same way.

The district court's conclusion that Ms. Seim must arbitrate "any and all Claims" is correct. But this Court doesn't have to wade through the permutations of Ms. Seim's argument to affirm. For the parties also agreed to arbitrate threshold questions of arbitrability through a delegation clause. Ms. Seim now focuses entirely on the scope of the agreement to arbitrate and, because of the delegation clause, that question must be arbitrated.

# STATEMENT OF THE CASE

## I.    HOMEAWAY PROVIDES LISTING SERVICES TO SUBSCRIBERS LIKE MS. SEIM.

HomeAway runs websites where individuals list residential vacation proper-ties they own or manage for travelers to rent on a short-term basis. Seim Br. 3. Owners or managers pay for listings, either by purchasing annual subscriptions or by paying HomeAway a fee for each booking. *Id.*

Deidre Seim has profited from HomeAway's services for years. Ms. Seim started listing one of her spare properties on HomeAway's websites in 2011. *Id.* Now, she lists five, all located in Louisville, Kentucky. *Id.* at 4. She has a sub-scription for each property; she renewed one in March 2016 (a month before fil-ing this suit) and has renewed the other four since then (as she admits in her brief). *Id.* at 4, 11, 34. All her properties are currently listed on HomeAway's websites.

## II.    MS. SEIM AGREED TO ARBITRATE ANY AND ALL CLAIMS WITH HOMEAWAY.

HomeAway and its users agree to terms and conditions for its websites, products, and services. It updates and revises the terms and conditions from time to time in order to keep them current and uniform. Ms. Seim's case spans mul-tiple versions of HomeAway's terms and conditions, and the key to understand-

ing the district court's decision (and to refuting Ms. Seim's appellate arguments) is to plot the facts of her case on a timeline of the various versions.

By the end of 2015, Ms. Seim had agreed to HomeAway's September 2015 Terms & Conditions five times—once with each subscription. *See* Seim Br. 4. That version gave HomeAway the right to amend the Terms & Conditions:

> We reserve the right, in our sole discretion, to amend these Terms, in whole or in part, at any time, with or without your consent and you acknowledge and agree that your consent to any such amendment is not required in the event that the proposed amendment is clerical and/or non-substantive in nature. Notification of any amendment will be posted on the Site by the indication of the last amendment date at the top of these Terms, and will be effective immediately.

ROA.56. The same provision in the Terms & Conditions also gave Ms. Seim power to opt out of any substantive modifications HomeAway makes to the Terms & Conditions:

> If you disagree with any non-clerical and/or substantive amendment to these Terms, then … your sole remedy as a member is to withhold your consent to the applicability of the proposed amendment to your use of the Site, in which case your use of the Site will continue to be governed by the terms and conditions that were applicable to your use of the Site during the then current term of your subscription as the same were in effect immediately prior to the proposed amendment you agree that you are responsible for keeping a copy of such terms.

*Id.* The September 2015 version is the contract Ms. Seim claims HomeAway breached in this case. ROA.29, 43.

In February 2016, HomeAway amended the Terms & Conditions. This version includes an identical provision giving HomeAway the right to amend the Terms & Conditions and giving Ms. Seim power to opt out. ROA.56, 163; *see* ROA.135. It also includes an arbitration agreement:

> **Any and all Claims will be resolved by binding arbitration, rather than in court**, except you may assert Claims on an individual basis in small claims court if they qualify. This includes any Claims you assert against us, our subsidiaries, users or any companies offering products or services through us (which are beneficiaries of this arbitration agreement). This also includes any Claims that arose before you accepted these Terms, regardless of whether prior versions of the Terms required arbitration.

ROA.157 (emphasis in original). A defined term, "Claims" refers to "any disputes or claims relating in any way to the Site, any dealings with our customer experience agents, any services or products provided, any representations made by us, or our Privacy Policy." *Id.* The import of the arbitration agreement is explained in plain, bolded text: "**There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including statutory damages, attorneys' fees and costs), and must follow and enforce these Terms of Use as a court would**." ROA.158 (emphasis in original).

If a claimant chooses arbitration rather than small-claims court, the arbitration clause provides that arbitrations "will be conducted by the American Arbitration Association (AAA) under its rules, including the AAA Consumer rules."

*Id.* One of the AAA rules states that all questions about "the existence, scope, or validity of the arbitration agreement" will be decided in arbitration. ROA.193 (AAA Rule 14). Arbitrations may be conducted in person, by telephone, or on the papers—the option is the claimant's. ROA.158. And when claims are asserted against HomeAway in arbitration, HomeAway will pay the arbitrator's fees and the claimant's filing fees, so long as the claimant seeks less than $10,000. *Id.*

Ms. Seim did not opt out of the February Terms & Conditions. Rather, in March 2016, she affirmatively consented to the February Terms & Conditions when she renewed her subscription for her Kentucky Derby Home. *See* Seim Br. 6; *see also* ROA.362–63. The Terms & Conditions state: "When members renew subscriptions, the terms in effect at the time of renewal will govern, provided that such terms may change as described above." ROA.56, 163.

On April 28, 2016, after Ms. Seim sued, HomeAway issued a new version of its Terms & Conditions. ROA.135; *see* ROA.41. Ms. Seim has since renewed her other four subscriptions under these or similar Terms & Conditions, which all contain the exact same arbitration agreement as the February Terms & Conditions. Nevertheless, the April Terms & Conditions are not at issue in this case.

HomeAway moved to compel arbitration under the *February* Terms & Conditions that Ms. Seim had agreed to, not the *April* Terms & Conditions. ROA.107.[1]

## III.   MS. SEIM SUES HOMEAWAY FOR ITS BUSINESS DECISION TO CHARGE FEES TO TRAVELERS, AND THE DISTRICT COURT COMPELS MS. SEIM TO ARBITRATE.

In February 2016, HomeAway began charging travelers fees for booking reservations through its websites, as reflected in the February Terms & Conditions. ROA.149–150. That was a business decision HomeAway announced, advertised, and explained nearly four months earlier. Ms. Seim contends that HomeAway's business decision somehow breaches its commitments to her. ROA.10. So in April 2016, she sued HomeAway, for herself and on behalf of a putative class of subscribers. ROA.7–42.

Below, Ms. Seim opposed arbitration on several grounds. First, she claimed the February Terms & Conditions were not legally binding, arguing that she did

---

1   The April Terms & Conditions, as well as the arbitration agreement therein, are at issue in a related appeal, *Arnold v. HomeAway*, No. 17-50088 (5th Cir.). Unlike Ms. Seim, Mr. Arnold did not renew his subscriptions *between* the times when the February and April Terms & Conditions went into effect; he renewed one of his subscriptions *after* the April Terms & Conditions went into effect. Since the Terms & Conditions contained no arbitration agreement before February 2016, the only arbitration agreement Mr. Arnold agreed to was the one in the April Terms & Conditions.

not manifest legally sufficient assent and that she did not provide any considera-tion on her end. ROA.258, 265. Second, she claimed the arbitration agreement in the February Terms & Conditions did not require arbitration of her claims be-cause she purports to assert her claims under an earlier version that included a forum-selection clause designating courts in Travis County, Texas as the venue to resolve disputes. ROA.262. Finally, she claimed the February Terms & Condi-tions were unenforceable as illusory and unconscionable. ROA.259, 264.

The district court granted HomeAway's motion and dismissed Ms. Seim's case. ROA.368–69. The court held the February Terms & Conditions, including the embedded arbitration agreement, were binding because Ms. Seim had af-firmatively assented to them when she renewed her subscription for the Ken-tucky Derby Home. ROA.364-65. The district court further held Ms. Seim's claims fall within the scope of the arbitration agreement in the February Terms & Conditions because it covers all disputes between the parties. *Id.* And, finally, the district court rejected Ms. Seim's illusoriness and unconscionability argu-ments and held the arbitration agreement is enforceable under Kentucky law. *See* ROA.365–66. (Ms. Seim and HomeAway agreed that Kentucky law applied to her challenges to the arbitration agreement because Kentucky is where Ms. Seim is billed and, thus, the state whose law applies under the Terms & Condi-tions' choice-of-law clause. *See* ROA.363 n.1; *see also* ROA.162 ("These Terms are governed by the Federal Arbitration Act, federal arbitration law, and for res-

ervations made by U.S. residents, the laws of the state in which your billing address is located, without regard to conflicts of laws.").)

# SUMMARY OF ARGUMENT

Under the FAA, courts ordinarily decide threshold questions about the scope of an arbitration agreement, as well as arbitration-specific defenses to arbitration. But parties can agree to delegate those threshold questions to an arbitrator. *See Rent-A-Center W., Inc., v. Jackson*, 561 U.S. 63, 68–69 (2010). Here, HomeAway and Ms. Seim did just that and agreed to a delegation clause as part of the arbitration agreement in the February Terms & Conditions. Because Ms. Seim concedes she agreed to those Terms & Conditions and that the arbitration clause is enforceable, she is bound to the delegation clause. All of her appellate arguments, therefore, must be decided by an arbitrator.

That's the straightest path to affirmance. The district court didn't mention the delegation clause, though; it ordered Ms. Seim to submit to arbitration because all of her objections lack merit. The district court correctly assessed the merits of Ms. Seim's objections, notwithstanding the parties' agreement that an arbitrator should have resolved them. Ms. Seim agreed to arbitrate "any and all Claims" against HomeAway. On appeal, she tries to make that broad phrase ambiguous and limit it to only claims in connection with her Kentucky Derby Home. Her arguments are partly sophistry, partly based on a misunderstanding of basic contract law, and entirely without merit. At bottom, she resists the idea that an arbitration agreement contained in one contract between two parties

might apply to claims arising out of another contract between the same parties. This happens all the time.

And Ms. Seim's other attacks on the validity of the arbitration agreement all rest on the same mistaken premise that the arbitration agreement impermissibly alters other, preexisting contracts. Ms. Seim concedes that she agreed to and is bound by the February Terms & Conditions, and that the agreement is supported by adequate consideration, *as to the Kentucky Derby Home*. Thus, her claims that the same February Terms & Conditions lack mutual assent and consideration *as applied to her other properties* fail. The arbitration agreement also is not illusory. HomeAway's right to amend the February Terms & Conditions is not absolute: Ms. Seim retained power to reject any amendments. Nor is it unconscionable for parties to have agreed to arbitrate claims that she has brought in connection with her four other properties.

After years of working together, HomeAway and Ms. Seim decided in early 2016, when she renewed her subscription for her Kentucky Derby Home, to arbitrate "any and all Claims," even claims that might have arisen *before* that contract or *from* earlier contracts. As such, this Court should affirm the district court's order compelling arbitration.

# ARGUMENT

This Court reviews rulings on motions to compel arbitration *de novo*. *Kubala v. Supreme Prod. Servs.*, 830 F.3d 199, 201 (5th Cir. 2016).

## I.    AN ARBITRATOR MUST DECIDE MS. SEIM'S OBJECTIONS.

All of Ms. Seim's appellate arguments rest on her theory that the words "any and all Claims" in the arbitration agreement don't mean what they say. She contends that "any and all Claims" has an implicit modifier and really means "any and all Claims *related to her Kentucky Derby Home*." She concludes that her claims are not arbitrable because they relate to her other properties (Seim Br. 16–29) and that the arbitration agreement, as applied to her claims, is illusory and unconscionable (*id.* at 29–44).

But all of Ms. Seim's appellate arguments go to the agreement's scope and thus are for an arbitrator to decide. *See Douglas v. Regions Bank*, 757 F.3d 460, 466 (5th Cir. 2014). "[P]arties can agree to arbitrate 'gateway' questions of 'arbitrability,' such as … *whether their agreement covers a particular controversy*." *Rent-A-Center W., Inc., v. Jackson*, 561 U.S. 63, 68–69 (2010) (emphasis added). When parties make such an agreement (often called a "delegation provision" or "delegation clause" because it delegates to an arbitrator questions that a court would otherwise decide), a court must enforce it. *See id.* at 71. According-

ly, "[i]f there is a delegation clause, the motion to compel arbitration should be granted in almost all cases." *Reyna v. Int'l Bank of Commerce*, 839 F.3d 373, 378 (5th Cir. 2016).

HomeAway and Ms. Seim agreed to a delegation clause. Their arbitration agreement expressly adopts the AAA rules, ROA.158, and one of those rules gives the arbitrator authority to resolve threshold arbitrability questions, ROA.193. Incorporating that particular AAA rule is a valid delegation clause, as this Court has repeatedly held. *See Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012) (collecting cases in accord from the First, Second, Eighth, Tenth, Eleventh, and Federal Circuits); *see also Cooper v. WestEnd Cap. Mgmt.*, 832 F.3d 534, 546 (5th Cir. 2016) (same for JAMS rules).

That's all this Court needs to affirm. There is no dispute that, when Ms. Seim renewed the subscription for her Kentucky Derby Home in March 2016, she agreed to the February Terms & Conditions and, thus, the arbitration agreement and delegation clause it contains. *See* Seim Br. 18. There also is no dispute that the arbitration agreement is valid; Ms. Seim concedes that it "applie[s] to her Kentucky Derby Home, even retroactively." *Id.* Given the undisputed enforceability of the arbitration agreement and delegation clause, the

merits of her objections aren't properly presented. Instead, they are for an arbitrator, and this Court should affirm the district court's judgment on this basis.[2]

## II.    THE ARBITRATION AGREEMENT IN THE FEBRUARY TERMS & CONDITIONS APPLIES TO ALL OF MS. SEIM'S CLAIMS.

### A.    THE PLAIN LANGUAGE OF THE ARBITRATION AGREEMENT DOES NOT DISTINGUISH AMONG TYPES OF CLAIMS.

The meaning of the words "any and all Claims" in the arbitration agreement is the lynchpin to Ms. Seim's appeal. The meaning of those words is "plain," as the district court easily and correctly concluded; the arbitration agreement covers claims relating in any way to HomeAway's products and services, regardless of whether a particular claim relates to one, all, or none of Ms. Seim's properties. ROA.363. Ms. Seim's contrary contention—that the arbitration agreement is limited to claims relating to just her Kentucky Derby Home—lacks merit.

---

2    The district court skipped over the threshold, delegation-clause issues, just as the same district judge did in the related case of *Arnold v. HomeAway, Inc.*, No. 17-50088 (5th Cir.). The district court compelled Ms. Seim to arbitrate because it found that all of her claims are clearly arbitrable and because her defenses lack merit. Those conclusions aren't wrong—we're confident the arbitrator will reach the same conclusions—and we support them. For consistency with Fifth Circuit authority, however, this Court should affirm and resolve this appeal under the delegation clause.

The phrase "any and all Claims" is clear and broad. "Any and all" are far-reaching terms; together, they plainly mean "every." *See, e.g., Nat'l Union Fire Ins. Co. v. Circle, Inc.*, 915 F.2d 986, 989 (5th Cir. 1990) (finding the phrase "any and all … claims" to be "clear and explicit language"); *Pilon v. Univ. of Minn.*, 710 F.2d 466, 467–68 (8th Cir. 1983) (holding that a general release of "any and all" claims "is clear and leaves no doubt that all claims potentially held by Pilon are waived"). The agreement's definition of "Claims" is comprehensive: "any disputes or claims relating in way to the Site, any dealings with our customer experience agents, any services or products provided, any representations made by us, or our Privacy Policy." ROA.157. And the parties agreed to arbitrate "any Claims that arose before [Ms. Seim] accepted the[] Terms, regardless of whether prior versions of the Terms required arbitration." *Id.*

Every one of Ms. Seim's claims against HomeAway comes within the scope of the phrase "any and all Claims." That phrase does not distinguish between claims that arose *before* Ms. Seim resubscribed the Kentucky Derby Home and claims that arose *after,* as Ms. Seim admits. *See* Seim Br. 18. The phrase also does not distinguish between claims in connection with the Kentucky Derby Home and claims Ms. Seim might have in connection with her four other properties or with no property in particular. The district court rightly compelled arbitration.

### B.   ARBITRATION AGREEMENTS OFTEN ENCOMPASS A WIDE RANGE OF CLAIMS.

Ms. Seim's appellate arguments are variations on one theme: that it is unfair, unreasonable, or unlawful to interpret an arbitration agreement inside one contract as reaching claims that might arise from other dealings between the same parties. She argues, for instance, that having to arbitrate claims related to her other four properties "treat[s] her five contracts as one contract contrary to how Kentucky law treats such transactions." Seim Br. 23. She argues that she consented to the February Terms & Conditions only as to the Kentucky Derby Home and retained her right to reject changes to the Terms & Conditions governing the other subscriptions. *See id.* at 26–29. (Yet, Ms. Seim agreed to an identical arbitration provision when she renewed her other subscriptions after filing suit.)

What Ms. Seim portrays as peculiar is actually commonplace. Lots of private contracts include arbitration agreements that cover claims unrelated to the particular contract containing the arbitration agreement. *See, e.g., Pennzoil Exploration & Production Co. v. Ramco Energy Ltd.*, 139 F.3d 1061, 1067 (5th Cir. 1998) (scope of agreement to arbitrate all disputes that "relate to" a contract is "not limited to claims that literally 'arise under the contract,' but rather embrace[s] all disputes between the parties having a significant relationship to the contract"); *Anderson v. Waffle House, Inc.*, 920 F. Supp. 2d 685, 687 (E.D. La.

2013) (enforcing an arbitration agreement in an employment contract that covered non-employment claims); *Tickanen v. Harris & Harris, Ltd.*, 461 F. Supp. 2d 863, 870–71 (E.D. Wisc. 2006) (compelling arbitration of FDCPA claims against debt-collector under arbitration agreement in credit card service agreement). Indeed, courts routinely reject Ms. Seim's very argument. *See, e.g.*, *In re Cox Enters., Set-top Cable Television Box Antitrust Litig.*, 835 F.3d 1195, 1202 (10th Cir. 2016) (interpreting arbitration agreement covering "disputes that 'arise out of *or in any way relate to*' any Cox goods or services," as requiring arbitration of "any dispute between Cox and a customer") (emphasis in original); *Southland Health Servs. v. Bank of Vernon*, 887 F. Supp. 2d 1158, 1164–65 (N.D. Ala. 2012) ("Whether or not [the plaintiffs' claims] arise *from* the agreement," is "beside the point" where "their claims are clearly within the scope of claims subject *to* the agreement [to arbitrate].") (emphases in original).

The scope of an arbitration agreement is set by its terms. After all, the "primary" purpose of the FAA is to ensure that "private agreements to arbitrate are enforced according to their terms." *Volt Info. Sciences, Inc. v. Bd. of Trustees*, 489 U.S. 468, 479 (1989); *see Doctor's Assocs. v. Casarotto*, 517 U.S. 681, 688 (1996). Parties are "generally free to structure their arbitration agreements as they see fit." *Volt*, 489 U.S. at 479. Just as they are free to *exclude* whatever claims they'd like from arbitration, *see Mitsubishi Motors Corp. v. Soler Chrys-*

*ler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985), they are free to *include* whatever claims, including claims that might arise from other contracts the parties have previously created. That freedom doesn't mean the contracts all merge, as Ms. Seim worries; nor does it mean that she can use her right to reject changes to the earlier contracts as a pass to sidestep the later arbitration agreement.

A hypothetical sharpens the point. Consider a scenario in which Ms. Seim agreed to a standalone arbitration agreement identical to the one embedded within the February Terms & Conditions. She would be hard pressed to argue that her agreement to arbitrate "any and all Claims" with HomeAway applied only to claims concerning one property and not others—no properties would be part of this hypothetical, standalone agreement.

The only difference here is that the arbitration agreement is embedded in a broader contract. That is not a material difference; the language of the arbitration agreement is the same. In the hypothetical and in reality, the parties agreed to arbitrate "any and all Claims" without regard to the property or subscription to which they relate. Placement of an arbitration agreement within a broader contract is no reason to construe its scope inconsistent with its plain text.

Accordingly, to affirm the district court, this Court doesn't have to hold that Ms. Seim's annual contracts converted to pay-per-booking contracts when she renewed the Kentucky Derby Home subscription. *See* Seim Br. 24. Nor does the Court have to decide whether Ms. Seim consented to changing the Terms &

Conditions applicable to her four other subscriptions. *See id.* at 28. The Court need only enforce the plain language of the arbitration agreement, which is separable from the underlying Terms & Conditions. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403–04 (1967).

### C.  MS. SEIM'S ATTEMPTS TO PORTRAY THE ARBITRATION AGREEMENT AS AMBIGUOUS LACK MERIT.

Ms. Seim contends that the arbitration agreement is ambiguous and can be read to cover only claims in connection with the particular property she renewed in March 2016. *See* Seim Br. 16–22. That argument is waived, irrelevant, and wrong. It is waived because Ms. Seim failed to raise it below. *See Reyes v. Manor Indep. Sch. Dist.*, 850 F.3d 251, 256 (5th Cir. 2017). It is irrelevant because any ambiguity in the scope of an arbitration agreement must be resolved *in favor of arbitration. See Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *G.M. Corp. v. Pamela Equities Corp.*, 146 F.3d 242, 251 (5th Cir. 1998). And it is wrong because the arbitration agreement can't reasonably be read Ms. Seim's way. *See Ky. Shakespeare Festival, Inc. v. Dunaway*, 490 S.W.3d 691, 695 (Ky. 2016) (competing interpretations give rise to ambiguity only when each is "reasonable reading" of the agreement).

As to this last point, to make the phrase "any and all Claims" appear ambiguous, Ms. Seim manufactures confusion. She contends that ambiguity arises not

from that phrase, but from HomeAway's business practices, from the use of defined terms in the arbitration agreement, and from a forum-selection clause in a prior version of the Terms & Conditions. None of that is confusing. And none of it suggests an alternative interpretation of the agreement to arbitrate "any and all Claims" related to HomeAway's products and services.

*First*, no ambiguity arises from "the manner in which HomeAway contracts with owners." Seim Br. 18. There is no authority for her assumption that agreements formed over the Internet aren't subject to the plain-meaning rule of contract interpretation. Extrinsic evidence cannot be used to *generate* ambiguity; it is reserved only to *resolve* ambiguity in the text of a written agreement. *E.g., Ky. Shakespeare*, 490 S.W.3d at 695–96. Since the text of the arbitration agreement is clear, the manner in which HomeAway and she contracted is irrelevant.

*Second*, the arbitration agreement is not ambiguous because of how it uses the word "Terms" (with a capital "T") and the word "terms" (with a lowercase "t"). *See* Seim Br. 19–21. Citing the notice that arbitrable claims "include[] any Claims that arose before you accepted these Terms, regardless of whether prior versions of these Terms required arbitration," Ms. Seim argues that she (mis)understood the arbitration agreement "as applying only to 'these' Terms." *Id.* at 20. Ms. Seim may be confused, but not because the text of the arbitration agreement is "inherently confusing." *Id.* The text is plain. *Cf. Ky. Shakespeare*,

490 S.W.3d at 695 ("The fact that one party may have intended different re-sults ... is insufficient to construe a contract at variance with its plain and un-ambiguous terms."). Indeed, the plain text removes any doubt that the scope of the arbitration agreement really is as broad as the agreement's opening line—"any and all Claims"—says: arbitration will include claims "regardless of whether prior versions of these Terms required arbitration" of those claims. The notice tells Ms. Seim that arbitration will include every claim related to HomeAway's products and services, including claims that are not covered by the particular Terms that have governed the Kentucky Derby Home, like claims re-lated to her other four properties.

*Finally*, no ambiguity arises from the forum-selection clause in the Septem-ber Terms & Conditions, which Ms. Seim argues creates confusion about how disputes are supposed to be resolved. *See* Seim Br. 27. Contracting parties often enter into multiple agreements, and sometimes, a new agreement will be incon-sistent with an earlier one. Kentucky law favors the last-in-time principle: "the later [agreement] will be construed to discharge the former" if they are incon-sistent. *Hornback v. Larue Cnty. Coop. Fair, Inc.*, No. 2013-001829, 2014 WL 7344390, at *4 (Ky. Ct. App. Dec. 24, 2014); *accord Reid v. Reid*, 20 S.W.2d 1015, 1016 (Ky. 1929). That's especially true for arbitration agreements, which the FAA makes "valid, irrevocable, and enforceable" as a matter of federal law, not-

withstanding any prior agreements the parties may have made. 9 U.S.C. § 2. So even if the arbitration agreement in the February Terms & Conditions were inconsistent with the forum-selection clause in the September Terms & Conditions, the arbitration agreement still controls. *See also* ROA.157 ("Any and all Claims will be resolved by binding arbitration, rather than in court. … This also includes any Claims that arose before you accepted these Terms, regardless of whether prior versions of the Terms required arbitration."); ROA.165 ("These Terms … supersede any prior agreement between us and you with respect to your use of the Site. … In the event of any conflict between these Terms and any others terms and conditions applicable to a product, tool, or service offered on our Site, the Terms herein shall prevail.").

III.  NO CONTRACT DEFENSE LIMITS THE SCOPE OF THE PARTIES' ARBITRATION AGREEMENT.

Ms. Seim's challenge to the scope of the arbitration agreement (although not properly before the Court) fares no better when repackaged as a challenge to mutual assent, consideration, illusoriness, and unconscionability. Ms. Seim treats these arguments as going to the validity and enforceability of the arbitration agreement, but they don't. Since she concedes that the arbitration agreement is valid and enforceable as to her Kentucky Derby Home, any challenge to the agreement as applied to other claims necessarily goes to the agreement's

scope. *See Gove v. Career Sys. Dev. Corp.*, 689 F.3d 1, 5 (5th Cir. 2012) ("[S]he concedes that the agreement is enforceable in certain circumstances. This concession was apt. This is a dispute concerning the scope of the arbitration clause, not its validity."). Ms. Seim's additional arguments, therefore, fail for all the same reasons her argument about the meaning of the phrase "any and all Claims" fails.

Each argument also lacks merit for additional, independent reasons. First, Ms. Seim contends that clickwrap agreements, like the February Terms & Conditions, provide insufficient notice for customers to legally assent under Kentucky law. But the Kentucky Supreme Court enforces clickwrap agreements. Second, Ms. Seim admits that the February Terms & Conditions are supported by consideration, but claims separate consideration is needed to support the scope of the arbitration agreement. No principle of law supports that contention. Third, Ms. Seim attempts to paint the September Terms & Conditions as illusory. They're not, but that's irrelevant—the arbitration agreement is in the February Terms & Conditions. Finally, Ms. Seim purports to find unconscionability from the very fact that an agreement to arbitrate is at issue. The FAA takes that argument off the table.

### A.  MS. SEIM CONCEDES SHE AGREED TO AND IS BOUND BY THE FEBRUARY TERMS & CONDITIONS.

Below, Ms. Seim argued that she was not provided sufficient notice of the arbitration provision in the February Terms & Conditions such that her assent to those terms was legally insufficient. ROA.265. But she "does not now dispute that her claims under her Kentucky Derby Home pay-per-booking contract were made subject to the arbitration provision when she renewed it." Seim Br. 39–40. That concession dooms any argument that she nevertheless lacked sufficient notice that the arbitration agreement applied to "any and all Claims." *See id.* at 40. If she had sufficient notice of the arbitration agreement's *existence*, she had sufficient notice of the arbitration agreement's *scope*.

At bottom, Ms. Seim urges the Court to hold the scope of embedded arbitration agreements are *per se* limited to the subject-matter of the contracts they reside in, no matter their plain language. Rules like that are forbidden by the FAA, since they single out arbitration agreements for less favorable treatment. *See, e.g., Kindred Nursing Ctrs. v. Clark*, — S. Ct. — , 2017 WL 2039160, at *5 (U.S. May 15, 2017) (FAA preempts Kentucky rule that required agreements granting powers of attorney to specifically authorize agents to agree, on principal's behalf, to arbitrate, regardless of whether agreement broadly granted agent authority to contract on principal's behalf). Because Ms. Seim concedes she is

bound by the February Terms & Conditions, she necessarily concedes she is bound to arbitrate "any and all Claims," which includes her claims in this case.

### B.  MS. SEIM HAD SUFFICIENT NOTICE OF THE ARBITRATION AGREEMENT.

Ms. Seim agreed to the February Terms & Conditions online. When she renewed the Kentucky Derby Home subscription, she checked a box beside the phrase "I accept the Terms and Conditions," which provided a link to February Terms & Conditions. This type of online agreement is often referred to as "clickwrap." *See, e.g., Hancock v. AT&T Co.*, 701 F.3d 1248, 1255 (10th Cir. 2012).

Notwithstanding her suggestion to the contrary, *see* Seim Br. 39 (discussing *Dixon v. Daymar Colls. Grp.*, 483 S.W.3d 332 (Ky. 2015)), the Kentucky Supreme Court upholds clickwrap agreements. In *Schnuerle v. Insight Communications*, 376 S.W.3d 561 (Ky. 2012), for instance, the court held that an arbitration clause "not readily visible to customers contracting for service via the Internet who must navigate to a separate page in order to see it" is not "concealed or disguised." *Id.* at 576–77. The court reasoned that "[t]he method of referring the reader to a different screen is a common practice in most web sites, and even in many written contracts (usually by reference to an addendum)." *Id.* at 577. Therefore, Ms. Seim cannot avoid arbitration on the ground that the February

Terms & Conditions—to which she concedes she affirmatively agreed—is a clickwrap agreement she may have elected to not read. *See* Seim Br. 39.

C.   MS. SEIM DOES NOT DISPUTE THAT THE FEBRUARY TERMS & CONDITIONS ARE SUPPORTED BY CONSIDERATION.

Ms. Seim argued to the district court that the February Terms & Conditions are wholly unsupported by consideration "because she did not pay any money when she agreed to the terms." ROA.366. Consideration can, of course, come in non-monetary forms. And the district court rightly concluded that Ms. Seim "did provide other consideration, such as her promise to pay HomeAway commissions on bookings she receives through the HomeAway[] website." *Id.* Ms. Seim does not dispute that conclusion on appeal.

Instead, Ms. Seim faults the district court for not "identify[ing] any consideration as it pertained to the *other four subscription contracts.*" Seim Br. 35 (emphasis added); *id.* at 36 ("There was no new consideration given to the other contracts when Ms. Seim renewed her Kentucky Derby Home that would support a finding that the arbitration provision applied to those other contracts."). That makes no sense. Consideration for the *February Terms & Conditions* is all that is required for Ms. Seim's agreement to arbitrate "any and all Claims" to be binding and applicable to "any and all Claims." *Cf. Glazer v. Lehman Bros.,*

394 F.3d 444, 453–54 (6th Cir. 2005) (embedded arbitration agreements do not
need separate consideration).

### D.    THE TERMS & CONDITIONS ARE NOT ILLUSORY.

Below, Ms. Seim argued that the *February* Terms & Conditions "are illuso-
ry because HomeAway reserves the unilateral right to change the terms" from
time to time. ROA.365. The district court correctly rejected that objection, and
Ms. Seim now appears to argue the *September* Terms & Conditions are illusory.
She notes that "[s]he had the right to reject the amendments to the September
Terms governing the four unexpired subscription contracts." Seim Br. 32. She
also contends (here's where it gets confusing) that, "[b]y denying Ms. Seim the
right to reject the arbitration provision … in the February Terms for her four
unexpired subscription contracts, the district court gave HomeAway the unilat-
eral right to modify or eliminate the arbitration provision," and "effectively
rendered the arbitration agreement purely illusory." *Id.* at 32–33. Ms. Seim
seems to be arguing that upholding the plain meaning of the arbitration agree-
ment somehow canceled her opt-out right in the September Terms & Condi-
tions, which in turn makes the February arbitration agreement illusory.

Whatever she means, it is irrelevant. Whether Ms. Seim must arbitrate her
claims has nothing to do with unilateral modification. Her agreement to arbi-
trate "any and all Claims" is not the product of a *unilateral* amendment to an

*existing* contract. Ms. Seim agreed to arbitrate when, in March 2016, she entered into a *new, bilateral* agreement with HomeAway. That bilateral agreement is not illusory because, among other things, Ms. Seim retained the right to opt out of future changes she didn't like. ROA.366. Moreover, Ms. Seim doubled down on agreeing to arbitrate when she subsequently renewed her other subscriptions.

Ms. Seim continues to try to take the focus off the February Terms & Conditions when arguing that HomeAway should have moved to arbitrate under the April Terms & Conditions instead. *See* Seim Br. 33–34. This is another waived argument. *See Reyes*, 850 F.3d at 256. Ms. Seim never asked the district court to apply the April Terms & Conditions to her case. HomeAway didn't either: HomeAway moved under the February Terms & Conditions because, at the time she filed suit, Ms. Seim had not agreed to the April Terms & Conditions.[3]

---

3  Ms. Seim probably invokes the April Terms & Conditions because the district court held them illusory, *under Texas law*, in a case pending before this Court, *Arnold v. HomeAway, Inc.*, No. 17-50088 (5th Cir.). That case is distinguishable, *see* n.1, *supra*, and wrong, as HomeAway is arguing in its appeal of that decision.

### E.    MS. SEIM'S UNCONSCIONABILITY ARGUMENTS ARE EQUALLY MERITLESS.

There is a "strong presumption" against unconscionability of arbitration agreements under Kentucky law, *Schnuerle*, 376 S.W.3d at 575, and Ms. Seim cannot overcome it. As the district court easily concluded, the arbitration agreement is not unconscionable. ROA.366–67.

Piggybacking on her "mutual assent" argument, Ms. Seim ascribes procedural unconscionability to the arbitration agreement on the ground that she lacked notice of new terms, like the arbitration agreement, when she clicked "I accept the Terms and Conditions." *See* Seim Br. 43. Arbitration agreements embedded in linked, clickwrap contracts are not procedurally unconscionable under Kentucky law. *Schnuerle*, 376 S.W.3d at 576–77.

Nor does Kentucky law require embedded arbitration agreements to appear near the top. *See* Seim Br. 43. Procedural unconscionability refers to "the use of fine or inconspicuous print and convoluted or unclear language that may conceal or obscure a contractual term." *Energy Home, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013). The parties' arbitration agreement does not include any offending print or language. The agreement is written in plain language, with important provisions bolded to catch the reader's eye. *See, e.g.*, ROA.157 ("**Any and all Claims will be resolved by binding arbitration, rather than in court ….**") (emphasis in original); ROA.158 ("**Any and all proceedings to resolve Claims will be**

conducted only on an individual basis and not in a class, consolidated or repre-sentative action. If for any reason a Claim proceeds in court rather than in arbi-tration we each waive any right to trial by jury.") (emphases in original). In-deed, the agreement explains—in bold—the difference between arbitration and litigation:

> There is no judge or jury in arbitration, and court review of an arbitration award is limited. However, an arbitrator can award on an individual basis the same damages and relief as a court (including statutory damages, attorneys' fees and costs), and must follow and enforce these Terms of Use as a court would.

*Id.* (emphasis in original). The arbitration agreement is neither hidden nor con-fusing and, therefore, is not procedurally unconscionable.

Ms. Seim further contends that the arbitration agreement is substantively unconscionable just because it sends disputes to arbitration. Seim Br. 43. That argument promotes the very problem the FAA was enacted to prevent—"widespread judicial hostility to arbitration agreements" that left arbitration agreements easier to invalidate than other types of agreements. *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011); *see Kindred Nursing*, 2017 WL 2039160, at *4–5. Unconscionability rules "that derive their meaning from the fact that an agreement to arbitrate is at issue," like the rule Ms. Seim advances here, are preempted. *Concepcion*, 563 U.S. at 339. Thus, Ms. Seim's substantive-ly unconscionability argument is a non-starter.

# CONCLUSION

The district court's judgment should be affirmed.


Respectfully submitted,

/s/ Bryan Killian

SCOTT DOUGLASS & McCONNICO LLP
Jane M.N. Webre
  Texas Bar No. 21050060
David D. Shank
  Texas Bar No. 24075056
303 Colorado St., Suite 2400
Austin, Tex. 78701
T: 512-495-6300

MORGAN, LEWIS & BOCKIUS LLP
Bryan Killian
Stephanie Schuster
1111 Pennsylvania Ave., NW
Washington, D.C. 20004
T: 202-739-3000

J. Warren Rissier
300 South Grand Ave., 22nd Floor
Los Angeles, Cal. 90071
T: 213-612-2500


May 24, 2017

# CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g)(1), I certify that BRIEF OF APPELLEE meets the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32.2 because, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), it contains 6,992 words. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32.1, as well as the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6).

/s/ Bryan Killian

Dated: May 24, 2017

# CERTIFICATE OF SERVICE

I certify that, on this May 24, 2017, I electronically filed BRIEF OF APPELLEE with the Clerk for the United States Court of Appeals for the Fifth Circuit. I used the Court's CM/ECF system, which serves registered CM/ECF users. All attorneys in this case are registered CM/ECF users and were served accordingly.

/s/ Bryan Killian

Dated: May 24, 2017